**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SHRAWNA D. B.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:18-CV-1014-K (BH)** |
| | § | |
| **NANCY A. BERRYHILL, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge** |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED**.

## I.  BACKGROUND

Shrawna D. B. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claims for a period of disability and disability insurance benefits (DIB) under Title II of the Social Security Act (Act), and for supplemental security income (SSI) under Title XVI of the Act. (docs. 1; 14.)

**A.      Procedural History**

On April 28, 2015, Plaintiff filed her applications for DIB and SSI alleging disability beginning on September 22, 2012.[1]  (doc. 10-1 at 17, 134-35.)[2]  Her claims were denied initially on

---

[1]  In her initial applications, Plaintiff alleged disability beginning on February 1, 2011.  (doc. 10-1 at 134-35.)  She subsequently amended her alleged onset date to September 22, 2012.  (*Id*. at 17, 288.)

[2]  Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

November 9, 2015, and upon reconsideration on February 2, 2016.  (*Id*. at 134-35, 158-59.)  On

March 8, 2016, she requested a hearing before an Administrative Law Judge (ALJ).  (*Id*. at 205.)

She appeared and testified at a hearing on March 6, 2017.  (*Id*. at 74-112.)  On April 26, 2017, the

ALJ issued a decision finding that she was not disabled, and denying her claims for benefits.  (*Id*.

at 17-31.)

Plaintiff appealed the ALJ's decision to the Appeals Council on June 16, 2017.  (*Id*. at 267-

68.)  The Appeals Council denied her request for review on March 16, 2018, making the ALJ's

decision the final decision of the Commissioner.  (*Id*. at 7.)  Plaintiff timely appealed the

Commissioner's decision under 42 U.S.C. § 405(g).  (*See* docs. 1; 14.)

## B.    Factual History

### 1.    Age, Education, and Work Experience

Plaintiff was born on April 10, 1980, and was 36 years old at the time of the hearing.  (doc.

10-1 at 30, 79.)  She had at least a high school education and could communicate in English.  (*Id*.

at 30.)  She had past relevant work experience as a data entry operator and child care worker.  (*Id*.

at 29-30.)

### 2.    Medical Evidence

On May 28, 2014, March 4, 2015, May 12, 2015, and June 23, 2015, Plaintiff met with

Sabahat Faheem, M.D., at Crescent Psychiatry.  (*Id*. at 416-23.)  In May 2014, she complained of

depressed feelings and was not doing well on Citalopram.  (*Id*. at 416.)  She had poor energy levels

and slept most of the time, but her anxiety had greatly improved and she was not having panic

attacks.  (*Id*.)  In March 2015, she was doing well on medication, had no depression, and her anxiety

and panic attacks were greatly improved.  (*Id*. at 422.)  She continued to have low energy, but had

2

fair concentration. (*Id.*) In May 2015, Plaintiff complained of anxiousness and frequent panic attacks. (*Id.* at 419.) She felt that her medications were not strong enough, but she denied feeling depressed. (*Id.*) She stated that her panic attacks interfered with her activities of daily living, and that she had poor sleep, low energy, and fair concentration. (*Id.*) In June, Plaintiff reported feeling depressed and anxious. (*Id.* at 413.) She would cry over small things, but she denied having panic attacks or suicidal ideations. (*Id.*) She was not depressed everyday, but she continued to have poor sleep, low energy, and fair concentration. (*Id.*) Her mental status exams consistently showed that she was alert, oriented times 4, and cooperative, with logical and well-organized thought processes, good judgment and insight, and no delusional thoughts or hallucinations. (*Id.* at 417.) Although her mental status exams were mostly identical, her moods were sad, "ok", anxious, and depressed, and her affect was sad, euthymic, and anxious. (*Id.* at 414, 417, 420, 423.) Throughout her appointments, she reported that taking care of her special needs son was a stressor for her. (*Id.* at 413, 416, 419, 422.) Dr. Faheem diagnosed her with major depressive disorder that was either mild or in remission, panic disorder without agoraphobia, hypertension, hyperlipidemia, neuropathy, and carpal tunnel syndrome, and her Global Assessment of Functioning (GAF) score was 50-55. (*Id.* at 414, 417-18, 420-21, 423.)

On May 19, 2015, Patrick Baldwin, LCSW, completed a psychosocial assessment for Plaintiff. (doc. 10-2 at 93.) She presented with obsessive compulsive disorder and depression. (*Id.*) She had a GAF score of 45, and Mr. Baldwin created a plan to decrease her depression. (*Id.* at 96.)

Between June 16, 2015 and November 17, 2015, Plaintiff underwent monthly individual therapy sessions with Mr. Baldwin. (*Id.* at 86-91.) In June, she was depressed with sad affect, and reported that she did not think her medications were working correctly, but she was hopeful she

would be doing better soon because her psychiatrist had changed her medications.  (*Id*. at 91.)  In July, she reported that her medication was working well and helping to prevent her from becoming overwhelmed with circumstances.  (*Id*. at 90.)  She was planning to go on a trip and was looking forward to it.  (*Id*.)  She had also been getting out more to socialize with family and friends.  (*Id*.)  In August, she presented as depressed with sad affect, and also exhibited psychomotor retardation and appeared fatigued.  (*Id*. at 89.)  She was waking up often during the night and not getting enough restorative sleep.  (*Id*.)  The symptoms of her depression and anxiety included dysphoric mood, anhedonia, insomnia, fatigue, decreased concentration, and anxiety attacks marked by shortness of breath, heart palpitations, and dizziness.  (*Id*.)  In September, she presented as fatigued and reported that she was still getting used to her new medication because her psychiatrist had changed it.  (*Id*. at 88.)  The medication made her very drowsy, and she seemed to doze off during the session at times.  (*Id*.)  In October, she had bright affect, and reported that she was feeling much better on new medication.  (*Id*. at 87.)  She was no longer experiencing mood swings, although she did become irritable with her son at times.  (*Id*.)  In November, she continued to do well with her medication and had bright affect.  (*Id*. at 86.)  The main stressor in her life at the time was her son failing math.  (*Id*.)  Mr. Baldwin continually discussed techniques to help manage her symptoms.  (*See id*. at 86-91.)

On October 19, 2015, Plaintiff went to Methodist Hospitals (Methodist) to establish care.  (doc. 10-2 at 38.)  A history of hypertension, type II diabetes, depression, and anxiety was noted.  (*Id*. at 39.)  Her mental status examination was grossly normal, and her affect and judgment were normal.  (*Id*. at 41.)  She was assessed with type II diabetes and hypertension, and it was noted that her anxiety and depression were managed by psychiatry and counseling.  (*Id*. at 41-42.)

On November 6, 2015, Matthew Wong, Ph.D., a state agency psychological consultant

(SAPC), examined Plaintiff's medically determinable impairments utilizing the psychiatric review technique (PRT) and determined that she had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. (doc. 10-1 at 140.) He found that although she had more than minimal mental limitations, she was able to function in the workplace, with some restrictions, on an effective and sustained basis. (*Id.*) That same day, he completed a mental residual functional capacity (RFC) assessment based on the medical evidence of record. (*Id.* at 142-44.) He opined that Plaintiff was no more than moderately limited in the areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation, and that she was able to understand, remember, and carry out detailed but not complex instructions, make decisions, concentrate for extended periods, interact with others, and respond to changes. (*Id.* at 143-44.)

On November 18, 2015, Plaintiff had a follow-up at Methodist for her type II diabetes. (doc. 10-2 at 31-33.) She reported doing better with her diabetes, and that she had started exercising again. (*Id.* at 33.) She tried to walk at least 30 minutes daily and had walked 2 miles that day. (*Id.*) She had a gym at her apartment complex and an elliptical machine in her home. (*Id.*) Regarding her depression and anxiety, it was noted that her conditions had been monitored by Dr. Faheem and Mr. Baldwin, and that her new medication regimen was slowly improving her mood and outlook. (*Id.*) She denied suicidal or homicidal ideations. (*Id.*)

On January 5, 2016, Plaintiff underwent another individual therapy session with Mr. Baldwin. (*Id.* at 85.) She had a dysphoric mood, sad affect, fatigue, worrying, and psychomotor retardation. (*Id.*) She reported that her mood swings prevented her from keeping any kind of

consistent schedule.  (*Id*.)  She took her medications as prescribed, but between her mood swings

and fluctuations in her sugar levels, she was unable to maintain any kind of consistency.  (*Id*.)  Mr.

Baldwin discussed using cognitive behavioral techniques that could help her correct the cognitive

distortions that possibly exacerbated her symptoms.  (*Id*.)

      On January 7, 2016, Dr. Faheem completed a mental status report for Plaintiff.  (doc. 10-1

at 488.) She noted that Plaintiff had received treatment since May 28, 2014, and that although she

was stable on her medications, her mood symptoms worsened with increased stress.  (*Id*.)  Plaintiff

was alert and oriented times 3 with improved mood and affect.  (*Id*.)  She became stressed off and

on due to daily stressors and responsibilities, but she had no suicidal ideations or aggressive

thoughts.  (*Id*. at 489.)  She was unable to do serial sevens and gave only one correct answer.  (*Id*.)

Her insight and judgment were fair, and her ability to abstract was intact.  (*Id*.)  Her ability to relate

to others and sustain work was fair to poor, and Dr. Faheem noted that she could not handle stress

well.  (*Id*. at 490.)  She further noted that Plaintiff's ability to respond to changes and stress in work

settings was poor, and that her prognosis was fair even though she could relapse during stressful

times.  (*Id*.)  Dr. Faheem reported her diagnoses as major depressive disorder in remission and panic

disorder without agoraphobia.  (*Id*. at 487, 489.)

      On February 2, 2016, March 1, 2016, and April 13, 2016, Plaintiff had therapy sessions with

Mr. Baldwin.  (doc. 10-2 at 84, 108-09.)  In February, she reported fatigue, psychomotor retardation,

and difficulty walking and tingling in her hands due to diabetes-related neuropathy.  (*Id*.)  She was

taking Lyrica for neuropathy and Viibryd for depression.  (*Id*.)  She reported continued mood swings

in spite of taking her medications.  (*Id*.)  Plaintiff had started exercising on a treadmill at home, and

felt that she was doing something good for her body and mind when she exercised.  (*Id*.) In March,

6

she had depressed mood with sad affect, fatigue, difficulty holding objects due to symptoms of carpal tunnel, sleepiness, and expressions of worry and worthlessness. (*Id*. at 109.) She reported being diagnosed with a pinched nerve in her neck, which was causing numbness in her legs and arms. (*Id*.) In April, she had calm affect. (*Id*. at 108.) She was wearing braces on her wrists due to carpal tunnel syndrome. (*Id*.) Plaintiff was going to physical therapy for problems in her legs, hands, and wrists, and she was hopeful that her pain levels would improve. (*Id*.)

Also on February 2, 2016, Dr. Wong again examined Plaintiff's medically determinable impairments utilizing the PRT and found that she had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. (doc. 10-1 at 165.) He found that although she had more than minimal mental limitations, she was able to function in the workplace, with some restrictions, on an effective and sustained basis. (*Id*. at 166.) That same day, he completed a mental RFC assessment based on the medical evidence of record. (*Id*. at 169-71.) He opined that Plaintiff was markedly limited in her ability to carry out detailed instructions, but no more than moderately limited in the remaining areas of understand and memory, sustained concentration and persistence, social interaction, and adaptation. (*Id*. at 169-70.) She was able to understand, remember, and carry out only simple instructions, make decisions, concentrate for extended periods, interact with others, and respond to changes. (*Id*. at 171.)

On March 9, 2016, Plaintiff had an initial physical therapy examination at Methodist Dallas Medical Center. (doc. 10-2 at 244.) She complained of right hip pain and right upper extremity radicular symptoms. (*Id*.) She was diagnosed with neuropathy in 2011 and began to have worsening numbness from her knee to her hip in October 2015. (*Id*.) Prolonged sitting, standing,

and bending exacerbated her lower back and hip pain.  (*Id*.)  At its worst, her pain was a 10 out of 10; it was a 5 out of 10 at its best.  (*Id*.)  She rated her radicular pain in her right arm at a 10 out of 10, but it could be as low as a 2 out of 10.  (*Id*.)  She had difficulty due to her shoulder pain and would occasionally sleep upright.  (*Id*.)  She was having difficulty cooking, cleaning, and with hygiene, and her son helped her with chores at home.  (*Id*.)  She exhibited impaired range of motion, abnormal gait, functional activity tolerance and endurance, and pain.  (*Id*. at 246.)  It was determined that she would benefit from physical therapy to help her impairments.  (*Id*.)

From April 29, 2016 to May 9, 2016, Plaintiff had 4 physical therapy sessions in which she complained of mild pain in her right hip.  (*Id*. at 255-61.)  At her last appointment, she continued to have hip pain, but reported no pain in her lower back.  (*Id*. at 261.)

From May 9, 2016 to February 14, 2017, Plaintiff had several follow-up visits with Dr. Faheem.  (*Id*. at 393-409.)  In May, she reported feeling fine except for pain from her carpal tunnel syndrome.  (*Id*. at 406.)  Her depression and anxiety had improved and were controlled with medication.  (*Id*. at 406-07.)  Her stressor was her special needs son.  (*Id*. at 406.)  Her energy level was good, and she denied irritability or angry outbursts, reported good concentration, and  denied feelings of worthlessness or guilt as well as suicidal thoughts.  (*Id*. at 407.)  Her mental status exam showed that her mood and affect were good, her thought processes were logical and well-organized, her judgment and insight were good, and she was alert and oriented times 4.  (*Id*.)  In October, she felt good but was depressed some days and okay on others.  (*Id*. at 402.)  Her energy level was good, and she had good concentration, no feelings of worthlessness or guilt, and no suicidal thoughts.  (*Id*. at 403.)  Her mental status examination remained the same.  (*Id*.)  In November, she felt depressed and as if her medication was no longer working.  (*Id*. at 398.)  She had hand and back pain from

carpal tunnel syndrome and a slipped disc, she had been crying when listening to the news, and she was feeling depressed because her mother was ill. (*Id*.) Her energy level was fair and she had good concentration. (*Id*. at 399.) Her mental status examination remained the same, except her mood was sad and her affect was depressed. (*Id*.) In February, she felt well and her left hand was doing well following carpal tunnel surgery. (*Id*. at 394.) She had also started having injections in her back, which provided some relief. (*Id*.) Her energy level was fair and she had good concentration. (*Id*. at 395.) Her mental status examination remained the same, except her mood was better and affect was improved. (*Id*.) She denied feeling anxious or having panic attacks throughout her appointments. (*Id*. at 395, 399, 403, 407.)

From June 22, 2016 to September 14, 2016 Plaintiff had monthly therapy sessions with Mr. Baldwin. (*Id*. at 368-72.) She presented with bright affect at one appointment, but as depressed with sad affect at the other appointments. (*See id*.) In June, she reported that she had been going to physical therapy for her hip pain but it was not helping, and she was still having problems with her carpal tunnel syndrome. (*Id*. at 372.) In July, Mr. Baldwin observed a depressed mood, sad affect, obvious fatigue, psychomotor retardation, slowed speech, and worrying. (*Id*. at 371.) Plaintiff discussed upcoming surgeries for her carpal tunnel syndrome and back, and stated that with everything going on, she was having trouble regulating her moods, which was exacerbated by her bipolar disorder. (*Id*.) In August, she presented with bright affect and explained that she had carpal tunnel surgery the prior week. (*Id*. at 370.) In September, she was very tired and did not have energy to do things she needed to do. (*Id*. at 368.) Her carpal tunnel on the left improved following surgery, but she continued to have back pain and was hoping to have surgery for it as well. (*Id*.)

On July 20, 2016, Plaintiff underwent left carpal tunnel release surgery. (*Id*. at 112.) She

was alert and oriented times 3, her Phelan's test was positive on the left, and her carpal tunnel test was positive bilaterally. (*Id*. at 115.) She tolerated the procedure well and was discharged that same day. (*Id*. at 114.)

On October 14, 2016, Plaintiff underwent an initial adult mental health assessment at Mental Health Mental Retardation (MHMR) of Tarrant County. (*Id*. at 63-66.) She reported that she was diagnosed with major depressive disorder, anxiety, panic attacks, and obsessive compulsive disorder in 2012, and her medications were not working. (*Id*. at 363.) She had poor sleep, varied appetite, declines in her memory, concentration, and functioning, racing thoughts, feeling of worthlessness and hopelessness, and changes in her self-care and relationships. (*Id*.) She exhibited normal speech patterns, and denied having elevated mood, energy levels, or depressed moods. (*Id*.) She also denied suicidal or homicidal ideations. (*Id*.) Although she reported a history of depression, her biggest complaint was that she was not getting enough sleep. (*Id*. at 366.) She did report significant symptoms consistent with major depressive disorder, however, that did not appear to be remedied by the medications she was taking. (*Id*.)

On October 25, 2016, Plaintiff had an appointment with Kayla Corn at MHMR. (*Id*. at 350.) She stated that she cried a lot and sometimes it started out of nowhere. (*Id*.) She slept well on her sleeping medications, but did not sleep at all when she did not take them. (*Id*.) She usually slept about 4-6 hours. (*Id*.) Her depression and anxiety had been difficult, and her anxiety was high because of calls from her son's school about difficulties he was having with his medications and her mom's breast cancer diagnosis. (*Id*.) She also stated that she over thought things and that she had obsessive compulsive disorder that really irritated her. (*Id*.)

On October 31, 2016, Plaintiff had an initial examination for physical therapy due to pain

in her lumbar area, right hip, and right knee.  (*Id*. at 179.)  She had to shift her weight when sitting due to pain, and she had to limit sitting and standing due to her pain.  (*Id*.)  Her lumbar pain could be at a 2 out of 10 at best and was at an 8 at the appointment.  (*Id*.)  Her right hip pain could be a 3 out of 10 at best and was at an 8 at the appointment.  (*Id*.)  Her right knee pain did not hurt at its best, but it was at a 10 at the time of the appointment.  (*Id*.)  Her pain was aggravated by sitting, standing, walking, using stairs, going from sitting to standing, bending, and voiding, but it was better when she was still.  (*Id*.)  Her mental status and cognitive function did not appear impaired.  (*Id*.) She ambulated into the office with an antalgic gait, favoring her right side.  (*Id*.)  She had problems in her wrists with decreased range of motion, right hand and finger pain with grasping motions, lumbar pain with palpation and movement, lumbar and thoracic weakness, right knee pain, right hip pain, right lower extremity weakness, and core muscle weakness.  (*Id*. at 181.)  It was determined that she would need physical therapy to meet her optimal functional potential.  (*Id*.)

From November 14, 2016 to January 6, 2017, Plaintiff underwent physical therapy with Tiffany Hunter, P.T., D.P.T.  (*See id*. at 188-232.)  She consistently reported pain in her lumbar area, right hip, and right knee, but physical therapy was helping relieve her pain, and at times she had no pain at all.  (*See id*. at 188, 191, 195, 198, 201, 208, 214, 217, 220, 222, 226, 228, 232.)  In December 2016, she reported a lot of traveling to visit with her family during the Christmas holiday weekend, and she had no pain.  (*Id*. at 222.)  In January 2017, she initially reported that she did not have any pain, but at her next appointment, her pain had increased due to exercising with a balance ball.  (*Id*. at 228, 232.)  It was consistently noted that sitting, standing, walking, using stairs, going from sitting to standing, bending, and voiding all aggravated her pain, but her pain was better when she was still.  (*Id*. at 188, 191, 195, 198, 201, 208, 214, 217, 220, 222, 226, 228, 232.)

On December 28, 2016, Plaintiff saw Kristin Garner, M.D., and Michael Castillo, M.D., with complaints of sharp lower back pain that was mainly in her right buttock and radiated toward the lateral side of her right hip. (*Id*. at 441-44.) Since 2011, it would come and go, and she had pain when lying down, sitting, stranding, or doing any type of activity. (*Id*.) Heating pads provided mild relief, as did physical therapy, but the relief would be gone when she returned home. (*Id*.) She was positive for back pain, depression, and nervousness/anxiousness. (*Id*. at 442.) She had tenderness in the greater trochanter, normal range of motion and normal strength in her right hip, and positive Faber's test. (*Id*.) A back exam showed tenderness in the sacroiliac area, normal range of motion, normal muscle strength, and normal gait. (*Id*. at 443.) Dr. Garner assessed her with piriformis syndrome of the right side. (*Id*. at 444.)

On January 1, 2017 and May 30, 2017, Plaintiff underwent piriformis injections with Dr. Garner. (doc. 10-1 at 57, 68.) She tolerated the procedures well and there were no complications. (*Id*. at 59, 69.)

On February 1, 2017, Plaintiff had another therapy session with Mr. Baldwin. (doc. 10-2 at 367.) She presented as depressed with sad affect and was somewhat anxious. (*Id*.) She had recently lost a family member, and the funeral was very traumatic for her as it brought back memories of the deaths of grandparents who raised her. (*Id*.) She had been having frequent crying spells that she was unable to control. (*Id*.) She also continued to experience severe, disabling back pain from a herniated disc, as well as carpal tunnel pain in her right hand that continued to prevent her from doing many things. (*Id*.)

On February 14, 2017, Dr. Faheem completed a mental function questionnaire for Plaintiff. (*Id*. at 373-78.) She had seen Plaintiff since October 2013, and her diagnoses included major

depressive disorder, diabetes, hypertension, neuropathy, and improving carpal tunnel syndrome. (*Id.* at 373.) The severity of her mental impairment and symptoms was mild, her mood was better, her anxiety had improved, her affect was euthymic, her insight and judgment were fair, and she had no suicidal ideations. (*Id.*) Her prognosis was fair. (*Id.*) Her signs and symptoms included decreased energy, generalized persistent anxiety, emotional lability, and somatization unexplained by organic disturbance. (*Id.* at 374.) Regarding her mental abilities and aptitudes to do unskilled work, Dr. Faheem opined that Plaintiff could perform the following independently, appropriately, effectively, and on a sustained basis: remember work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, make simple work-related decisions, perform at a consistent pace without an unreasonable number and length of rest breaks, ask simple questions or request assistance, and accept instructions and respond appropriately to criticism from supervisors. (*Id.* at 375.) Dr. Faheem opined that Plaintiff could not maintain attention for 2-hour segments, maintain regular attendance and be punctual within customary and usually strict tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, complete a normal workday and work week without interruptions from psychologically based symptoms, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, deal with normal work stress, or be aware of normal hazards and take appropriate precautions, however. (*Id.*)

Regarding her mental abilities and aptitudes to do semi-skilled and skilled work, Dr. Faheem opined that Plaintiff could not understand and remember detailed instructions, carry out detailed instructions, set realistic goals or make plans independently of others, or deal with stress of semi-

skilled and skilled work. (*Id*. at 376.) Regarding her mental abilities and aptitudes to do particular types of jobs, Dr. Faheem opined that Plaintiff could interact appropriately with the general public and use public transportation, but she could not maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, or travel in unfamiliar places. (*Id*.) Plaintiff did not have a low IQ or reduced intellectual functioning, and her psychiatric conditions did not exacerbate her experience of pain or any other physical symptoms. (*Id*.) She opined that Plaintiff would also have difficulty working at a regular job on a sustained basis because she had poor concentration, and she would stay weak and lethargic throughout the day. (*Id*. at 377.) Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in her evaluation. (*Id*.) Dr. Faheem noted that her condition and functional limitations had slightly improved since June 30, 2016, and found that she could manage benefits in her own best interest. (*Id*. at 377-78.)

Also on February 14, 2017, Dr. Hunter completed a physical medical source statement for Plaintiff. (*Id*. at 379-82.) Her symptoms included decreased wrist range of motion and right hand and finger grasping motions, lumbar pain and weakness, right knee pain, and right hip pain. (*Id*. at 379.) She had continuous pain in her lumbar and thoracic areas, right knee and hip, and wrists bilaterally. (*Id*.) Dr. Hunter opined that Plaintiff's symptoms could be expected to last at least 12 months, and that emotional factors contributed to the severity of her symptoms and functional limitations. (*Id*.) Psychological conditions that affected her physical condition included depression and anxiety. (*Id*. at 380.) Dr. Hunter estimated that Plaintiff could not walk a city block without rest or severe pain, could sit for 30 minutes before needing to get up, could stand for 20 minutes before needing to sit or walk around, and could sit and stand/walk less than 2 hours total in an 8-hour workday. (*Id*.) She further found that Plaintiff needed a job that permitted her to shift

14

positions at will from sitting, standing, or walking, needed to have periods to walk for at least 5 minutes every 20 minutes, and needed to take unscheduled breaks hourly and for about 10 minutes during a workday due to pain/paresthesias and numbness. (*Id*.) She did not need to have her leg elevated and did not need a cane or other assistive device to stand/walk. (*Id*. at 381.) Plaintiff could only occasionally carry less than 10 pounds and never carry more than 10 pounds; she could rarely twist, stoop, bend, crouch, squat, or climb stairs; and she could never climb ladders. (*Id*.) Dr. Hunter found no limitations in Plaintiff's reaching, handling, or fingering. (*Id*.) Plaintiff was likely to be off task about 25% of the time or more and be absent 4 or more days per month from work, and her impairments were likely to produce good and bad days. (*Id*. at 382.) Dr. Hunter concluded that Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. (*Id*.)

Dr. Hunter also completed a clinical assessment of Plaintiff's pain that same day, and found that her pain was present to such an extent as to be distracting to adequate performance of daily work activities. (*Id*. at 383.) Physical activity, such as walking, standing, sitting, bending, stooping, and moving extremities would greatly increase her pain to such a degree as to cause some distraction or total abandonment of a task. (*Id*.) Side effects from her medications could be expected to be severe and to limit effectiveness due to distraction, inattentiveness, and drowsiness. (*Id*. at 384.)

Mr. Baldwin also completed a mental function questionnaire for Plaintiff on February 14, 2017. (*Id*. at 386-91.) He noted that Plaintiff's diagnoses included recurrent major depressive disorder, severe panic disorder, chronic insomnia, herniated disc with chronic pain, and carpal tunnel syndrome with chronic pain. (*Id*. at 386.) Her GAF score was 40, and her highest GAF score in the prior year was 45. (*Id*.) Her prognosis was guarded. (*Id*.) Her signs and symptoms included

15

anhedonia, appetite disturbance, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, recurrent and intrusive recollections of a traumatic experience, psychomotor agitation or retardation, recurrent obsessions or compulsions, sleep disturbance, emotional withdrawal or isolation, recurrent severe panic attacks, and persistent irrational fear of a specific object, activity, or situation. (*Id.* at 387.)

Regarding her mental abilities and aptitudes to do unskilled work, Mr. Baldwin opined that Plaintiff could understand, remember and carry out very short and simple instructions, make simple work-related decisions, ask simple questions or request assistance, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, and respond appropriately to changes in a routine work setting. (*Id.* at 388.) She could not remember work-like procedures, maintain attention for 2 hour segments, maintain regular attendance and be punctual within customary strict tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, deal with normal work stress, or be aware of normal hazards and take appropriate precautions. (*Id.*) Mr. Baldwin opined that she had none of the mental abilities and aptitudes needed to do semiskilled and skilled work. (*Id.* at 389.) Regarding her abilities and aptitudes to do particular types of jobs, Plaintiff could interact appropriately with the general public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, travel in unfamiliar places, and use public transportation. (*Id.*) She did not have low IQ or intellectual functioning, and her psychiatric condition did not exacerbate her experience of

16

pain or other physical symptoms. (*Id.*) She could be expected to miss more than 4 days of work per month, her impairment could be expected to last at least 12 months, and her impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. (*Id.* at 390.) Mr. Baldwin concluded that Plaintiff would have difficulty working at a regular job on a sustained basis because her physical and psychiatric symptoms prevented her from performing any job duties. (*Id.*) He noted that her condition and functional limitations had not improved since June 30, 2016. (*Id.*)

On February 15, 2017, Stephen L. Hines, M.D., completed a medical source statement for Plaintiff. (*Id.* at 392.) He noted that her symptoms included anxiety, depression, some right hip pain that was decreasing, and numbness and tingling in her leg. (*Id.*) Her prognosis was unclear, but appeared to be improving. (*Id.*)

On March 7, 2017, Plaintiff had a follow-up appointment after a right piriformis injection on January 17, 2017. (*Id.* at 446.) She reported great improvement in the pain and that the numbness she was previously feeling had resolved as well. (*Id.*) She developed sharp pains in the midline lower back that did not radiate a few weeks after the injection, however. (*Id.*) She denied having any numbness or tingling in her legs or having any weakness. (*Id.*)

On April 19, 2017, Plaintiff presented for a follow-up for pain in her right gluteal and lower back. (doc. 10-1 at 63.) She reported doing very well since her last visit, and that she had started working out and losing weight. (*Id.*) She continued to have moderate discomfort in her right gluteal muscles, but her lower back pain seemed to have improved. (*Id.*) She expressed interest in having another right piriformis injection, and reported performing a home exercise program with good results. (*Id.*) Her gait was normal, but she had pain with palpation over her right piriformis muscle,

17

belly, and near the insertion point at her greater trochanter.  (*Id*. at 64.)  She also had mild discomfort with bilateral facet loading, but it did not reproduce her pain.  (*Id*.)

On May 24, 2017, she had another follow-up with Dr. Garner.  (*Id*. at 65.)  She reported increasing pain since her prior visit, and some pain radiating down the posterior aspect of her thigh.  (*Id*.)  She felt numbness on the anterior and lateral aspect of her thigh, but stated that it was better last time following her piriformis injection.  (*Id*.)  She had continued to go to the gym, watch her diet, and lose weight, and she was still doing the home exercise program.  (*Id*.)

### 3.    Hearing Testimony

On  March 6, 2017, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (*Id*. at 74-112.)  Plaintiff was represented by an attorney.  (*Id*. at 76.)

### a.    *Plaintiff's Testimony*

Plaintiff testified that she was 5'5" and 224 pounds.  (*Id*. at 88-89.)  She lived in an apartment with her 15 year old son and their dog.  (*Id*. at 79.)  Her son had ADHD and anxiety, and she was his primary care giver.  (*Id*. at 79-80.)  She graduated from high school and had some college education.  (*Id*. at 80-81.)  She had not worked for compensation since 2011.  (*Id*. at 81.)  She had a driver's license, but had some problems due to her vision and her hands becoming numb.  (*Id*. at 80, 98.)  She drove at most about 30 miles per week if her son had a doctor's appointment.  (*Id*. at 98.)  She spent her days in bed and sleeping when she did not have any doctor's appointments, but she did grocery shop at the supermarket with her son's help.  (*Id*. at 87-88, 97.)  Her son also helped her with laundry and chores around the apartment.  (*Id*. at 97-98.)

At the hearing, she was wearing a brace on her right knee due to arthritis.  (*Id*. at 81-82.)  She had been in physical therapy for her knee and back issues.  (*Id*. at 82.)  She had also recently had her

back checked by Dr. Garner and received injections. (*Id*. at 82-84.) She took Tylenol for pain. (*Id*. at 84.) She also had carpal tunnel syndrome, and underwent on her left hand the prior year, which helped some. (*Id*. at 85.) She was still waiting to have carpal tunnel surgery on her right hand. (*Id*.) Due to the issues with her right hand, she had trouble cleaning, chopping, opening cans, holding onto a jar, showering, brushing her teeth, and washing her face. (*Id*. at 85-86.) She also had trouble holding her cell phone because her hands would go numb, but she had no trouble dressing herself other than with buttons sometimes, and with bending down to put on her shoes due to her high blood pressure. (*Id*. at 91-92.) She did not write or type much because her hands would lock up, and she had a trigger finger problem with the middle finger on her right hand, which caused her finger to get stuck in a downright position. (*Id*. at 92-93.) She also had mental issues that affected her ability to work. (*Id*. at 87.) She would have random panic attacks, and at times she would sit up and cry when watching the news. (*Id*.) She did not go to a lot of social gatherings because she would get anxiety from being around a lot of people. (*Id*.) She had also been diabetic since 2001. (*Id*. at 90.)

Plaintiff also had issues with her right hip. (*Id*. at 93-94.) She had a slipped disc in her back that pushed on a nerve on her hip and caused her leg to go numb every night. (*Id*. at 94.) She did not experience numbness during the day, but she did have pain in the back of her hip and thigh. (*Id*.) Her back pain was constant, but it would get better when she used a heating pad or vibrating seat cover. (*Id*. at 95.) She had a list of exercises to perform at home for her back pain, but she only performed them about 5 days per month. (*Id*. at 96.) She also did not sleep well and had insomnia. (*Id*. at 96-97.) She slept about 5 hours per night but would go back to sleep after she dropped her son off at school, and she would sleep all day. (*Id*. at 97.) She estimated that she could walk for about 5 minutes before her hip would start hurting, and she would have to sit down, and that she

could sit for no more than 10 minutes due to her back hurting.  (*Id*. at 98-99.)  She was sitting at the hearing for about 30 minutes, but her back was hurting.  (*Id*. at 99.)  When her back would start hurting, she would have to get up and stand/walk around to ease her pain.  (*Id*. at 99-100.)  She estimated that she could stand for about 10 minutes before her back and right hip would start hurting.  (*Id*. at 100.)  She thought she could lift about 5 pounds.  (*Id*.)  She attended church service for 1 hour and 15 minutes every Sunday, and she was able to stay through the entire service by switching between sitting on her right and left sides.  (*Id*. at 100-01.)  She had left early at times due to her pain, but she would return.  (*Id*. at 101.)  She was not otherwise active in the church, did not participate in sports, and did not go to movies or concerts due to the crowds.  (*Id*.)  Being around crowds gave her anxiety and overwhelmed her.  (*Id*. at 101-02.)

### b.    *VE's Testimony*

The VE testified that Plaintiff had past work experience as a data entry operator, DOT 203.582-054 (SVP 4, sedentary), and as a child care worker, DOT 359.677-018 (SVP 4, light).  (*Id*. at 103.)

The VE considered a hypothetical individual with the same age, education, and work history as Plaintiff who could perform light exertional level work with the following limitations: she could frequently handle, finger, and feel with bilateral upper extremities, and understand, remember, and carry out simple tasks and instructions.  (*Id*. at 103-04.)  This individual would not be able to perform Plaintiff's past work, but she could work as a collator, DOT 208.685-010 (SVP 2, light), with 5,310 jobs in Texas and 234,180 jobs nationally; school bus monitor, DOT 372.667-042 (SVP 2, light), with 7,340 jobs in Texas and 213,020 jobs nationally; and a counter clerk, DOT 249.366-010 (SVP 2, light), with 8,370 jobs in Texas and 237,610 jobs nationally.  (*Id*. at 104.)

The VE next considered a hypothetical individual who could perform only sedentary work with the same limitations as the first hypothetical individual.  (*Id*.)  This individual would not be able to perform Plaintiff's past work, but could work as a call out operator, DOT 237.367-014 (SVP 2, sedentary), with 6,460 jobs in Texas and 46,320 jobs nationally; envelope addresser, DOT 209.587-010 (SVP 2, sedentary), with 3,587 jobs in Texas and 55,184 jobs nationally; and a food order clerk, DOT 209.567-014 (SVP 2, sedentary), with 17,340 jobs in Texas and 190,390 jobs nationally.  (*Id*. at 104-05.)

The VE then considered a hypothetical individual that was the same as the second individual, but could only occasionally handle, finger, and feel.  (*Id*. at 105.)  This individual would not be able to perform Plaintiff's past work, but could still perform work as a call out operator as described above; a government elections clerk, DOT 205.367-030 (SVP 2, sedentary), with 1,834 jobs in Texas and 21,148 jobs nationally; and a system surveillance monitor, DOT 379.367-010 (SVP 2, sedentary), with 7,340 jobs in Texas and 113,020 jobs nationally.  (*Id*. at 105-06.)

In response to questioning by Plaintiff's attorney, the VE considered a hypothetical individual that was the same as the first hypothetical individual, but could only occasionally handle, finger, and feel.  (*Id*. at 107.)  This individual would not be able to perform work as a collator but could still work as a counter clerk and school bus monitor.  (*Id*.)  These jobs did not involve detailed functions.  (*Id*.)  An individual would not be able to work if she were off task 25% of the time or more.  (*Id*. at 108.)  For the jobs described by the VE, an individual would be allowed to miss one day per month with a doctor's note.  (*Id*.)

The VE also considered a hypothetical individual who could sit no more than 2 hours a day, and stand and walk no more than 2 hours a day.  (*Id*.)  This individual would be precluded from

21

performing any work. (*Id.*) An individual as described in either the first, second, or third hypothetical, who needed to leave her work station and walk for about 5 minutes every 20 minutes, would be precluded from any competitive employment. (*Id.* at 109.) An individual who would be unable to maintain attention for 2 hour segments would be precluded from any competitive employment. (*Id.*) The jobs described by the VE did not allow for special supervision. (*Id.*) If the individual could not sustain an ordinary work routine without special supervision, the individual would not be able to perform Plaintiff's past work or other work. (*Id.* at 110.) Similarly, an individual who could not complete a normal workday or work week without interruptions from psychologically based symptoms would also be precluded from maintaining competitive employment. (*Id.*) An individual who was unable to deal with normal work stress would also be precluded from working. (*Id.*) The VE stated that her testimony was consistent with the Dictionary of Occupational Titles (DOT). (*Id.* at 111.)

## C.    <u>ALJ's Findings</u>

The ALJ issued a decision denying benefits on April 26, 2017. (*Id.* at 17-31.) At step one, he determined that Plaintiff had not engaged in substantial gainful activity since September 22, 2012, the alleged onset date. (*Id.* at 19.) At step two, the ALJ found that Plaintiff had the following severe impairments: diabetes mellitus, carpal tunnel syndrome, hypertension, obesity, depression, and anxiety. (*Id.*) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairments or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (*Id.* at 21.)

The ALJ then determined that Plaintiff retained the RFC to perform light work, but she could only frequently handle, finger, and feel with her bilateral upper extremities, and she could

understand remember, and carry out simple tasks and instructions. (*Id*. at 24.) At step four, the ALJ found that Plaintiff was unable to perform any of her past relevant work. (*Id*. at 29.) At step five, the ALJ found that transferability of job skills was not an issue because utilizing the Medical-Vocational Rules, she was not disabled whether or not she had transferable job skills, and considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (*Id*. at 30.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from September 22, 2012, through April 26, 2017. (*Id*. at 31.)

## II. LEGAL STANDARD

Judicial review of the commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program

is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" will not be found to be disabled.

4.    If an individual is capable of performing the work he had done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(I)-(v)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents four issues for review:

1    Did the Acting Commissioner apply the proper legal standard to evaluate Plaintiff's severe impairments?

The Plaintiff contends that the answer is "No."

2.    Did the ALJ properly evaluate medical opinions in determining Plaintiff's residual functional capacity?

The Plaintiff argues that the answer is "No."

3.    Did the ALJ properly evaluate Plaintiff's severe mental impairments and consider functional limitations resulting therefrom in determining her residual functional capacity?

The Plaintiff contends the answer is "No."

4.     Did the ALJ establish the existence of work which the Plaintiff can perform consistent with her residual functional capacity?

The Plaintiff contends that the answer is "No."

(doc. 14 at 2-3.)

## A.     Severity Standard

Plaintiff first argues that the   ALJ applied an improper legal standard to evaluate her severe impairments.  (*Id*. at 4.)

### 1.     *Stone* Standard

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments." 20 C.F.R. § 404.1520(a)(4)(ii),(c) (2012).  To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'" *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010).  Under the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).  The Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104–05 (5th Cir. 1985).  Accordingly, to meet the severity threshold at step two, "the claimant need only . . . make a *de minimis* showing that her impairment is severe enough to interfere with her ability to do work." *Anthony v. Sullivan*, 954 F.2d 289, 294 n.5 (5th Cir. 1992) (citation omitted).  "Because a determination [of] whether an impairment[ ] is severe requires an assessment of the functionally limiting effects of an impairment[], [all] symptom-related limitations and restrictions must be considered at this step."  SSR 96-3P, 1996 WL 374181, at *2 (S.S.A. July 2, 1996).  Ultimately, a

26

severity determination may not be "made without regard to the individual's ability to perform substantial gainful activity." *Stone*, 752 F.2d at 1104.

Here, in reciting the applicable law, the ALJ initially stated that he must "determine whether the claimant has a medically determinable impairment that is 'severe' or a combination of impairments that is 'severe.'" (doc. 10-1 at 18) (citing to 20 C.F.R. § 404.1520(c) and 416.920(c)). He explained that "[a]n impairment or combination of impairments is 'severe' within the meaning of the regulations if it has *more than a minimal effect* on an individual's ability to perform basic work activities" and that "[a]n impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have *no more than a minimal effect* on an individual's ability to work." (*Id*. (emphasis added) (citing to 20 C.F.R. §§ 404.1521, 416.921;Social Security Ruling (SSR) 85–28, 96-3p, and 96-4p).  The ALJ did not cite to *Stone*. (*See id*.)

The *Stone* standard provides no allowance for even a minimal interference with a claimant's ability to work.  *Murphy v. Berryhill*, No. 3:17-CV-01260-M-BH, 2018 WL 4568808, at *14 (N.D. Tex. Sept. 24, 2018); *see also Bounds v. Astrue*, No. 4:10-CV-942-Y, 2011 WL 4091507, at *4 (N.D. Tex. July 19, 2011) (holding that an ALJ fails to apply the *Stone* standard by requiring "more than a minimal" effect on an individual's ability to work.); *Craaybeek v. Astrue*, No. 7:10-CV-054-BK, 2011 WL 539132, at *6 (N.D. Tex. Feb. 7, 2011) (determining the "minimal effect" standard is "wholly inconsistent with *Stone*").  "Rather, the *Stone* standard requires a finding of "severe" if the impairment interferes with an individual's ability to work *at all*."  *Connie G. v. Berryhill*, No. 3:17-CV-03342-M (BT), 2019 WL 1294441, at *4 (N.D. Tex. Mar. 21, 2019) (emphasis in original) (citing *Stephanie Z. v. Berryhill*, No. 3:17-CV-1581-BN, 2018 WL 4467470, at *3 (N.D. Tex. Sept.

18, 2018)).  The severity standards recited by the ALJ were rejected in *Stone* "as inconsistent with the Social Security Act."  *Connie G.*, 2019 WL 1294441, at *4 (citing *Stone*, 752 F.2d at 1104–05); *accord Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) ("[T]his Court evaluated the Secretary's severity regulation, and determined that it was inconsistent with the statutory language and the legislative history of the Act.").  Additionally, "[a]n ALJ's referral to the applicable social security regulations and rulings, including 20 C.F.R. § 416.920(c), 20 C.F.R. § 416.921, SSR 85-28, SSR 96-3p, and SSR 96-4p, does not substitute as a proper construction of the *Stone* standard." *Scott v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-0152-BF, 2012 WL 1058120, at *7 (N.D. Tex. Mar. 29, 2012) (citing cases).

Given the difference between the ALJ's constructions of the severity standard and *Stone*, coupled with his failure to specify which standard he actually applied in his disability evaluation, the ALJ applied an incorrect standard of severity.  *See Connie G.*, 2019 WL 1294441, at *4 (determining that the ALJ applied the incorrect severity standard where he recited language identical to the language recited in this case); *see also Garcia v. Astrue*, No. 3:08-CV-1881-BD, 2010 WL 304241, at *3 (N.D. Tex. Jan. 26, 2010) (explaining that courts in this district have consistently rejected, as inconsistent with *Stone*, the definition of severity under 20 C.F.R. § 404.1520(c) that the ALJ cited in this case).

### 2.    Harmless Error

Even where the ALJ fails to specifically determine the severity of a claimant's impairments at step two, remand is not required where the ALJ proceeds to the remaining steps of the disability analysis and considers the alleged impairment's—or its symptoms—effects on the claimant's ability to work at those steps.  *See, e.g., Herrera*, 406 F. App'x at 3 & n.2; *Abra v. Colvin*, No.

3:12-CV-1632-BN, 2013 WL 5178151, at *4 (N.D. Tex. Sept. 16, 2013) (listing cases).  An ALJ's failure to apply the correct standard at step two in determining the severity of the claimant's impairments (i.e., *Stone* error) "does not mandate automatic reversal and remand, and application of harmless error analysis is appropriate [ ] where the ALJ proceeds past step two in the sequential evaluation process."  *Gibbons v. Colvin*, No. 3:12-CV-0427-BH, 2013 WL 1293902, at *14 (N.D. Tex. Mar. 30, 2013) (citing cases); *accord Newbauer v. Colvin*, No. 3:14-CV-3548-BH, 2016 WL 1090665, at *15 (N.D. Tex. Mar. 21, 2016) (applying harmless error analysis); *see also Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012) (per curiam) (applying harmless error analysis where the ALJ failed to cite *Stone* in finding at step two that the claimant's alleged mental impairment was non-severe).  Accordingly, Plaintiff must show that the ALJ's step two error was not harmless.  *See Garcia v. Astrue*, No. CIV. M-08-264, 2012 WL 13716, at *12 (S.D. Tex. Jan. 3, 2012) ("Assuming . . . that the ALJ erred in failing to specifically address whether Plaintiff's right leg venous thrombosis was a severe impairment, the next question is whether the ALJ committed reversible error.").  In the Fifth Circuit, harmless error exists when it is "inconceivable" that a different administrative determination would have been reached absent the error.  *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Here, Plaintiff argues that she was prejudiced by the ALJ's failure to apply the proper legal standard because the evidence establishes that her "piriformis syndrome interferes with her ability to perform work-related activities."  (doc. 14 at 5-6.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: diabetes mellitus, carpal tunnel syndrome, hypertension, obesity, depression, and anxiety. (doc. 10-1 at 19.)  Because none of Plaintiff's impairments or combination of impairments met or medically

equaled a listed impairment at step three, the ALJ proceeded to assess Plaintiff's RFC.  (*See id.* at 21, 24.); *see also* 20 C.F.R. § 404.1520a(d)(3); *Boyd*, 239 F.3d at 705 ("If the [claimant's] impairment is severe, but does not reach the level of a listed disorder, then the ALJ must conduct a [RFC] assessment.").  The ALJ determined that Plaintiff had the RFC to perform light work with the following limitations: she could only frequently handle, finger, and feel with her bilateral upper extremities, and she could understand, remember, and carry out simple tasks and instructions.  (*See* doc. 10-1 at 24-29.)  In assessing her RFC, he explained that he "considered all symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence."  (*Id.*)  Consideration of all "medically determinable impairments . . . including [those] that are not 'severe,'" and "all of the relevant medical and other evidence," is required by the regulations when determining a claimant's RFC.  *See* 20 C.F.R. § 404.1545(a)(2)-(3) (2012); SSR 85–28, 1985 WL 56856, at *3.

The ALJ acknowledged that Plaintiff complained of back and hip pain throughout 2016, but specifically noted that she was not diagnosed with piriformis syndrome until December 2016.  (doc. 10-1 at 20.)  Although her pain returned in late 2016, she reported no pain in 2017 after undergoing more physical therapy and an injection, and she needed no pain medication.  (*Id.* at 21.)  The ALJ also referenced Plaintiff's reports of leg numbness, but found that the record showed that this resolved with treatment; he noted that Plaintiff did not identify limitations in walking or standing later in her application process and that she was using the elliptical for 30 minutes per day at one point.  (*Id.* at 26.)  Plaintiff was also able to sit through the hearing, and she testified that she could usually sit through her weekly church service, which lasted over an hour, if she shifted her weight.  (*Id.*)  The ALJ acknowledged that although Plaintiff presented frequently for treatment of her

impairments, her treatment was mostly conservative and primarily consisted of medication, braces, physical therapy, and injections. (*Id*. at 27.) He also noted that instructions from her doctors to increase her activity level showed that they considered her to be capable of performing light exertional activities. (*Id*. at 28.) The ALJ further considered Dr. Hunter's opinions, although he noted that she was not an acceptable medical source to render a medical opinion, and found that her opinions regarding Plaintiff's extreme physical limitations were inconsistent with Plaintiff's own reports and the record as a whole. (*Id*. at 29.)

As noted, the ALJ's RFC assessment should be based on all of the relevant evidence in the record and should account for all of the claimant's impairments, including those that are non-severe. *See* 20 C.F.R. § 404.1545(a)(3). The ALJ's determination necessarily includes an assessment of the nature and extent of a claimant's limitations and determines what the claimant can do "on a regular and continuing basis." 20 C.F.R. §§ 404.1545(b)-(c), 416.945(b)-(c); SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996); *accord Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) ("Both [20 C.F.R. § 404.1545 (2002) and SSR 96–8p (1996)] make clear that RFC is a measure of the claimant's capacity to perform work 'on a regular and continuing basis.'"). SSR 96-8p distinguished between what the ALJ must consider and what the ALJ must include in a written decision. Here, the ALJ's narrative discussion shows he applied the correct legal standards and considered all of the relevant evidence in determining Plaintiff's RFC.

Although the ALJ did not explicitly find that Plaintiff's alleged piriformis syndrome was a severe impairment at step two, he expressly considered her diagnosis, symptoms, and own reports and testimony along with her responses to treatment. (doc. 10-1 at 20-21, 26-29.) The ALJ ultimately concluded that although Plaintiff could not perform her past relevant work, she was

capable of performing other jobs that existed in significant numbers in the national economy, and therefore she was not disabled. (*Id.* at 29-31.) The ALJ's disability decision shows that he considered Plaintiff's alleged symptoms and her piriformis syndrome diagnosis. To the extent that the ALJ rejected her diagnosed impairment, as the trier of fact, he was entitled to do so if he found it was not supported by the objective medical evidence. *See Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) ("Conflicts in the evidence are for the [ALJ] . . . to resolve."). At step two, it was still Plaintiff's burden to prove she had an impairment or combination of impairments that rendered her "incapable of engaging in any substantial gainful activity." *See Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986); *see also Fraga*, 810 F.2d at 1301. A "physical" or "mental" impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C.A. § 423(d)(3) (West 2004). In determining Plaintiff's severe limitations at step two and RFC, the ALJ expressly relied on physical examinations, diagnostic findings, and all of the evidence in the medical record. (*See* doc. 10-1 at 20-21, 25-29.)

In conclusion, the ALJ's error was harmless with respect to Plaintiff's piriformis syndrome because it is inconceivable that he would have assessed a different RFC—and thereby reached a different disability determination—if he had applied the *Stone* severity standard at step two. *See Taylor*, 706 F.3d at 603 (finding that the ALJ's failure to cite to *Stone* at step two was harmless, and "remand [was] not required since there [was] no evidence in the record that [the claimant's] mental health claims [were] severe enough to prevent him from holding substantial gainful employment" at step five); *Goodman*, 2012 WL 4473136, at *10 (*Stone* error was harmless where the ALJ considered the effects of the claimant's mental impairments, including those that were not severe,

32

on his ability to work at step four). Remand is therefore not required on this ground.

**B.    <u>RFC Assessment</u>**[3]

Plaintiff also argues that the ALJ erred in determining her RFC. (doc. 14 at 2-3.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1. The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994).

A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*,

---

[3] Because Plaintiff's second and third issues implicate the ALJ's RFC assessment, they will be considered together. (*See* doc. 14 at 2-3.)

67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). Courts "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence". *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding Plaintiff's symptoms and limitations, and reviewing the evidence of record, the ALJ determined that she had the RFC to perform light work, except she could only frequently handle, finger, and feel with her bilateral upper extremities, and she could understand, remember, and carry out simple tasks and instructions. (doc. 10-1 at 24-29.)

### 1.    Medical Opinions

Plaintiff contends that the ALJ failed to give due consideration to the medical opinion evidence from Dr. Faheem and Mr. Baldwin in determining his RFC. (doc. 14 at 6-10.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1529(b). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. *Id*. § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id*. § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a

34

claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id*. § 404.1527(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id*. § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id*. A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 455–56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id*. at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other

35

physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id*. at 458.

### a.    *Dr. Faheem*

Plaintiff argues that the ALJ failed to properly consider the medical opinion evidence from her treating psychiatrist, Dr. Faheem. (doc. 14 at 6-10.)

Dr. Faheem completed a mental status report for Plaintiff on January 7, 2016. (*See* doc. 10-1 at 487-89.) Plaintiff's mood and affect were improved, and although she became stressed off and on due to daily stressors and responsibilities, she had no suicidal thoughts or aggressive thoughts, and her insight and judgment were fair. (*Id*. at 488-89.) Dr. Faheem found that Plaintiff was unable to do serial sevens or handle stress well, and her ability to relate to others and sustain work was fair to poor. (*Id*. at 490.) She noted that Plaintiff's ability to respond to changes and stress in work settings was poor, and while her prognosis was fair, she could relapse during stressful times. (*Id*.)

Dr. Faheem also completed a mental function questionnaire for Plaintiff on February 14, 2017. (doc. 10-2 at 373-78.) The severity of her mental impairment and symptoms was mild, her mood was better, her anxiety had improved, her affect was euthymic, her insight and judgment were fair, she had no suicidal ideations, and her prognosis was fair. (*Id*. at 373.) Her signs and symptoms included decreased energy, generalized persistent anxiety, emotional lability, and somatization unexplained by organic disturbance. (*Id*. at 374.) Regarding her mental abilities and aptitudes to do unskilled work, Dr. Faheem opined that Plaintiff could remember work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, make simple work-related decisions, perform at a consistent pace without an unreasonable number and length of rest breaks, ask simple questions or request assistance, and

accept instructions and respond appropriately to criticism from supervisors. (*Id*. at 375.) Plaintiff could not maintain attention for 2-hour segments, maintain regular attendance and be punctual within customary and usually strict tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, complete a normal workday and work week without interruptions from psychologically based symptoms, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, deal with normal work stress, or be aware of normal hazards and take appropriate precautions, however. (*Id*.) Regarding her mental abilities and aptitudes to do semi-skilled and skilled work, Dr. Faheem opined that Plaintiff could not understand and remember detailed instructions, carry out detailed instructions, set realistic goals or make plans independently of others, or deal with stress of semi-skilled and skilled work. (*Id*. at 376.) Regarding her mental abilities and aptitudes to do particular types of jobs, Plaintiff could interact appropriately with the general public and use public transportation, but she could not maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, or travel in unfamiliar places. (*Id*.) Dr. Faheem ultimately opined that Plaintiff would have difficulty working at a regular job on a sustained basis because she had poor concentration, and she would stay weak and lethargic throughout the day. (*Id*. at 377.)

The ALJ considered Dr. Faheem's opinions and determined that they were entitled to only partial weight because the evidence she cited did not support debilitating limitations, and her opinions were inconsistent with the evidence from treatment notes. (doc. 10-1 at 28-29.) The ALJ also noted that in support of her assessment, she cited to Plaintiff's mild deficits, better mood, and improved anxiety. (*Id*. at 29.) The ALJ found that the records indicated that Plaintiff had been

37

doing well and that she was stable on medication in 2016.  (*Id.*)

Although the ALJ did not make a specific finding as to each of the factors in 20 C.F.R. § 404.1527(c)(1), he specifically stated that he considered opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927.  (*See id.* at 24.)  His decision reflects consideration of the factors: he found that Dr. Faheem was Plaintiff's treating source since October 2013, that the evidence cited in support of her assessment did not support debilitating limitations, that the evidence cited in support was also inconsistent with the evidence from his treatment notes, that Plaintiff had generally been doing well according to her records, and that Plaintiff was stable on medication in 2016.  (*Id.* at 23, 28-29.)  The regulations require only that the Commissioner "apply the factors and articulate good cause for the weight assigned to the treating source opinion." *See* 20 C.F.R. § 404.1527(c)(2); *Brewer v. Colvin*, No. 3:11-CV-3188-N, 2013 WL 1949842, at *6 (N.D. Tex. Apr. 9, 2013), *adopted by*, 2013 WL 1949858 (N.D. Tex. May 13, 2013); *Johnson v. Astrue*, No. 3:08-CV-1488-BD, 2010 WL 26469, at *4 (N.D. Tex. Jan. 4, 2010).  "The ALJ need not recite each factor as a litany in every case." *Brewer*, 2013 WL 1949842, at *6 (citing *Johnson*, 2010 WL 26469, at *4).

The ALJ's reasons for assigning only partial weight to Dr. Faheem's medical source statement, combined with his review and analysis of the objective record, satisfy his duty under the regulations and constitute "good cause" for affording only partial weight to Dr. Faheem's opinions. *See Brewer*, 2013 WL 1949842, at *6 (finding the ALJ's explanation as to why he did not give controlling weight to a treating physician's opinion constituted "good cause" even though he did not make a specific finding as to each of the factors set forth in 20 C.F.R. § 1527 (c)(2)); *Johnson*, 2010 WL 26469, at *4 (same); *Hawkins v. Astrue*, No. 3:09-CV-2094-BD, 2011 WL 1107205, at *6 (N.D.

Tex. March 25, 2011) (same); *Gomez v. Barnhart*, No. SA-03-CA-1285-XR, 2004 WL 2512801, at *2 (W.D. Tex. Nov. 5, 2004) (finding the ALJ complies with regulations if the resulting decision reflects that consideration was given to medical consultant's opinion).

>           **b.    Mr. Baldwin**

Plaintiff also argues that the ALJ failed to properly consider the medical source statement from her counselor, Mr. Baldwin. (doc. 14 at 6-10.)

The ALJ acknowledged but gave only "little weight", to Mr. Baldwin's opinion that Plaintiff could not perform most of the mental activities required for work. (doc. 10-1 at 28.) He noted that as a social worker, Mr. Baldwin was not an acceptable medical source under the social security regulations but still considered his opinion. (*Id*.) The ALJ found it inconsistent with the evidence of record and unsupported by his own treating notes and Plaintiff's own reports. (*Id*.) He also noted that Mr. Baldwin did not cite to any debilitating objective deficits, and Plaintiff primarily complained of situational stressors involving her son or mother and of physical problems. (*Id*.)

Although Mr. Baldwin treated Plaintiff several times, he was a licensed counselor and therefore not an "acceptable medical source." *See* 20 C.F.R. § 404.1513(d) (providing a non-exhaustive list of non-medical sources, which includes "therapists" and "counselors"). Mr. Baldwin's opinion was not a "medical opinion" and could not be used to establish the existence of a medically determinable impairment. *See* 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources . . . ."); 20 C.F.R. § 416.913(a) (providing that only "evidence from acceptable medical sources" is used to determine whether the claimant has "a medically determinable impairment"). Although the ALJ was required to and did consider Mr. Baldwin's opinion, along with all the other evidence, he was not required

to give it any weight or analyze it using the six-factor test. *See Hayes v. Astrue*, No. 3:11-CV-1998-L, 2012 WL 4442411, at *3 (N.D. Tex. Sept. 26, 2012); SSR 06–03R, 2006 WL 2329939, at *4 (S.S.A.2006). Moreover, as the trier of fact, the ALJ was free to decide whether Mr. Baldwin's opinion was supported by the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) (per curiam); *see also Newton*, 209 F.3d at 452 ("Conflicts in the evidence are for the [ALJ] ... to resolve."). He did not err in discounting Mr. Baldwin's opinion. *See Berry v. Astrue*, No. 3:11-CV-02817-L (BH), 2013 WL 524331, at *19–20 (N.D. Tex. Jan. 25, 2013) (determining that the ALJ did not err in discounting a counselor's opinion), *adopted by*, 2013 WL 540587 (N.D. Tex. Feb. 13, 2013).[4]

In summary, the ALJ properly considered Dr. Faheem's and Mr. Baldwin's opinions, and remand is not required on this issue.

### 2.    Functional Limitations

Plaintiff next argues that the ALJ failed to incorporate her paragraph B functional limitations in the RFC assessment. (doc. 14 at 10.)

The functional limitations found in paragraph B are simply used to rate the severity of the claimant's mental impairments at steps 2 and 3. SSR 96–8P, 1996 WL 374184, at *3 (S.S.A. July 2, 1996). The mental RFC assessment requires a more detailed analysis in which the ALJ itemizes the paragraph B limitations and expresses them in terms of work-related functions, including "the abilities to understand, carry out, and remember instructions; use judgment in making work-related

---

[4] Plaintiff also appears to argue that the ALJ committed error under *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995) by substituting his own judgment in making his RFC assessment. (docs. 14 at 9-10; 16 at 8.) She did not expressly raise this issue in her brief as required by the scheduling order, however. (*See* doc. 11 at 2.) Even if the issue had been properly raised, it would not provide a basis for remand because the ALJ examined the entire record including treatment notes, Plaintiff's own reports and testimony, and the opinion evidence in determining Plaintiff's RFC, and substantial evidence supports his decision. (*See* doc. 10-1 at 24-29.)

decisions; respond appropriately to supervision, co-workers, and work situations; and deal with changes in a routine work setting." *See id*. at *3–6. Although the ALJ must consider the claimant's "paragraph B" functional limitations when determining the mental RFC, he is not required to incorporate them into his RFC assessment "word-for-word." *Westover v. Astrue*, No. 4:11-CV-816-Y, 2012 WL 6553102, at *8 (N.D. Tex. Nov. 16, 2012); *Owen v. Astrue*, No. 3:10–CV–1439–BH, 2011 WL 588048, at *20 (N.D. Tex. Feb. 9, 2011).

At steps two and three, in considering the paragraph B criteria, the ALJ found that Plaintiff had "moderate difficulties" in both her ability to understand, remember, or apply information and her ability to concentrate, persist, or maintain pace.  (doc. 10-1 at 23.)  He next determined that she had the mental RFC to understand, remember, and carry out simple tasks and instructions.  (*Id*. at 24.)  At step five, based on the testimony of the VE, the ALJ concluded that Plaintiff had the RFC to perform jobs that existed in significant numbers in the national economy. (*Id*. at 30.)

In determining Plaintiff's mental RFC, the ALJ explained that the limitations identified in paragraph B were not an RFC assessment, but were used to rate the severity of mental impairments at steps 2 and 3.  (*Id*. at 24.)  He stated that his assessment "reflect[ed][the] degree of limitation that [he] found in the 'paragraph B' mental functional analysis."  (*Id*. at 24.)  He gave partial weight to Dr. Wong's 2015 opinions that Plaintiff retained the RFC to understand, remember, and carry out detailed but not complex instructions; make decisions; concentrate for extended periods; interact with others; and respond to changes; but more weight to his 2016 opinion that Plaintiff could only understand, remember, and carry out simple instructions because it was more consistent with the evidence of limitations in mood and affect combined with the evidence of limited memory and concentration.  (*Id*. at 28.)  He gave little weight to Mr. Baldwin's opinion that Plaintiff could not

perform most of the mental activities required of work because he was not an acceptable medical source and his opinion was inconsistent with the evidence of record.  (*Id.*)

The ALJ also considered the evidence from Dr. Faheem and gave only partial weight to her opinion that Plaintiff could perform very few mental activities necessary for work because the evidence she cited in support of her opinion did not support debilitating limitations and was inconsistent with the evidence from treatment notes, and Plaintiff had generally been doing well and was stable on medication.  (*Id*. at 23, 28-29.)  He also noted that Plaintiff was not limited beyond working with simple instructions because although she initially reported that she had difficulty understanding, following written instructions, and remembering during the application process,  she later reported that she could follow instructions, concentrate, remember, and understand without difficulty.  (*Id*. at 23, 28.)

Because the ALJ's decision shows that he considered and incorporated Plaintiff's functional limitations he found in paragraph B into his mental RFC assessment, substantial evidence supports his assessment.  *See Mattie D. C.*, 2019 WL 1084185, at *5 (finding that the ALJ adequately considered the plaintiff's moderate limitations in her mental functional abilities when making the RFC determination); *Smith v. Colvin*, No. 3:13-CV-1884-N-BN, 2014 WL 1407437, at *4–5 (citing cases) (recognizing that "courts in this circuit have held that an RFC limited to "simple work" reasonably incorporates a moderate or even marked limitation in concentration, persistence, or pace."), *adopted by*, 2014 WL 1407440 (N.D. Tex. Apr. 11, 2014); *see also Cornejo v. Colvin*, No. EP-11-CV-470-RFC, 2013 WL 2539710, at *9 (W.D. Tex. June 7, 2013) ("[T]he limitations on which the RFC is based are not required to be included verbatim in the RFC or in a hypothetical to the vocational expert."); *Jones v. Astrue*, No. 3:11-CV-3416-M-BH, 2013 WL 1293900, at *17–18

(N.D. Tex. Mar. 7, 2013), *adopted by*, 2013 WL 1296503 (N.D. Tex. Mar. 29, 2013) (ALJ's failure to incorporate the "exact language" of PRT into RFC did not require remand in absence of showing of prejudice).

Plaintiff also argues that there is a conflict between the ALJ's assessment of her mental limitations and the RFC determination because the ALJ's finding that she had moderate difficulties in understanding, remembering, or applying information means that she was "significantly limited" in her ability to follow one or two-step oral instructions to carry out a task. (docs. 14 at 11-12; 16 at 9-10.) Plaintiff appears to contend that the ALJ's finding of a moderate limitation shows that she is significantly limited to a degree not captured by the ALJ's RFC assessment. (*See id*.) As recently found by another court in this district in response to a nearly identical argument, "Plaintiff offers no authority for the assertion that 'moderate' is the same as 'significant,' such that the [C]ourt must find a conflict between the ALJ's determination of Plaintiff's abilities with respect to the four broad functional areas and the RFC assessment." *Mattie D. C. v. Berryhill*, No. 3:18-CV-281-D-BT, 2019 WL 1084185, at *4 (N.D. Tex. Feb. 13, 2019), *adopted by*, 2019 WL 1077372 (N.D. Tex. Mar. 7, 2019). Additionally, to the extent Plaintiff argues that the there was a conflict between the ALJ's assessment of her mental limitations and the VE's testimony, the ALJ was only obligated to reasonably incorporate into his hypothetical all of Plaintiff's disabilities that he recognized, and he could properly reject portions of the VE's testimony that were based on hypotheticals which he subsequently found unsupported by the medical evidence. *See Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985); *Mattie D. C.*, 2019 WL 1084185, at *5 (citing *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001)).

Because the ALJ committed no reversible error, remand is not required on this issue. *See*

43

*Smith*, 2014 WL 1407437, at *5 (finding that the ALJ did not commit reversible error where he included all of the plaintiff's functional limitations in his RFC assessment); *Gonzalez v. Comm'r Soc. Sec. Admin.*, No. 3:10-CV-02003-O (BF), 2012 WL 1058114, at *7 (N.D. Tex. Jan. 26, 2012) (determining that the ALJ properly included the plaintiff's functional limitations in his RFC assessment), *adopted by*, 2012 WL 1065459 (N.D. Tex. Mar. 29, 2012).

## C.    Conflict with the DOT

Lastly, Plaintiff contends that the ALJ failed to establish alternative work she could perform. (doc. 14 at 13-14.)  She argues that there was a conflict between the VE's testimony and the DOT because the jobs identified by the VE were performed at reasoning level 2, which "requires the ability to 'apply common sense understanding to carry out detailed but uninvolved written (or) oral instructions," and the ALJ found that she was "limited to the ability to understand, remember, and carry out 'simple tasks and instructions.'" (*Id.*)

Courts in the Fifth Circuit, "as well as appellate and district courts outside the Fifth Circuit, have already determined that there is no direct or apparent conflict between an RFC limiting a plaintiff to 'simple' instructions [or tasks] and a VE's testimony that a plaintiff may perform work at a reasoning level of two."  *Smith*, 2014 WL 1407437, at *6.  Rather, "[a] reasoning level of two has repeatedly been found to be consistent with the reasoning ability to understanding [sic] simple instructions and perform simple tasks."  *Castillo v. Colvin*, No. H-12-3512 , 2014 WL 897798, at *14 (S.D. Tex. Mar. 6, 2014) (collecting cases).  The Court agrees with the authority from other courts that supports a determination that Plaintiff's limitation to "understand, remember, and carry out simple tasks and instructions" could support her ability to work in jobs with a reasoning level of two.  *See id.* (finding that "jobs with a DOT reasoning ability of two are not inherently

inconsistent with [the] ability to understand simple instructions and perform simple tasks."); *Swindle v. Colvin*, No. H-12-0323, 2013 WL 12106130, at *6 (S.D. Tex. Sept. 23, 2013) (finding that a plaintiff with the ability to understand simple instructions and perform simple tasks could perform jobs at a reasoning level of two); *see also Smith*, 2014 WL 1407437 at *6 (citing cases) (determining that a limitation to simple, repetitive, routine tasks supported work at a reasoning level of two or three); *Carter v. Commissioner*, No. 6:12-CV-265, 2013 WL 2318886 *9 (E.D. Tex. May 28, 2013) ("an occupational Reasoning Level of 2 or below is within the ambit of 'simple' type limitations"); *Fletcher v. Astrue*, No. 5:09-CV-70-BG, 2010 WL 1644877, at *4 (N.D. Tex. Mar. 31, 2010) ("Courts have acknowledged that the ability to perform non-complex work is consistent with reasoning level two"), *adopted by*, 2010 WL 1644874 (N.D. Tex. Apr. 23, 2010). Because jobs performed at a reasoning level of two are not inconsistent with Plaintiff's RFC, there is no conflict between the VE's testimony and the DOT. Remand is therefore also not required on this issue.

## IV. RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on this 22nd day of April, 2019.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

45

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_Irma Carrillo Ramirez_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

46